UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MICHAEL MANLEY,              )
                             )
            Plaintiff        )
                             )
        v.                   )   Case No. 2:04 cv 275
                             )
JO ANNE BARNHART, Commissioner )
of Social Security,          )
                             )
            Defendant        )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Michael Manley, on October 29, 2004. For the reasons set forth below, the motion is DENIED.

Background

The plaintiff, Michael Manley, applied for Disability Insurance Benefits and Supplemental Security Income on June 12, 2002, alleging disability beginning October 1, 2001. (Tr. 57-59, 290-91) The Social Security Administration ("SSA") initially denied his application on August 30, 2002, and again upon reconsideration January 16, 2003. (Tr. 292-99) Manley requested a hearing before an Administrative Law Judge ("ALJ") on February 20, 2003, and a hearing was held before ALJ Robert Asbille on October 1, 2003. (Tr. 35, 316) Subsequent to the hearing in which Manley, his girlfriend Aloma Robinson, Medical Expert Dr. Ashok Jilhewar, and Vocational Expert ("VE") Ervin Roth testified, ALJ Asbille denied Manley's application by written decision on November 25, 2003. (Tr. 16-20, 316) Manley requested a review of ALJ Asbille's decision by the Appeals Council on January 12,

2004.  (Tr. 11) Following a denial of his request for review by
the Appeals Council on June 10, 2004, Manley filed a complaint in
this court on July 20, 2004.  (Tr. 5-7)

Manley was born on November 22, 1956, and was 44 at the
onset date of his disability.  (Tr. 290) He was living in Whit-
ing, Indiana with his girlfriend of 12 years, Aloma Robinson, and
three children at the time of the ALJ hearing.  (Tr. 328, 332)
Manley has a GED, and until October 2001, he held a series of
jobs as a laborer or driver.  (Tr. 76, 86) His most recent job
was as a van driver from 1994 to 2001, which involved driving
railroad employees and school children, and lifting up to 10
pounds.  (Tr. 37, 326) He stopped working on October 1, 2001,
when pain in his back and legs prevented him from getting into
his vehicle.  (Tr. 70)

Manley appears to have been diagnosed with diabetes by May
2000, when the earliest notes from one of Manley's treating
physicians, Dr. Wojciech Ornowski, stated that he had type II
diabetes.  (Tr. 147) On November 16, 2000, Manley underwent a
fluorescein angiogram and was diagnosed with diabetic retinopathy
and macular edema.  (Tr. 136, 267) On November 30, 2000, Dr.
Ornowski's notes state that the angiogram was prescribed because
of Manley's problems with blurred vision, but the results of this
test do not appear in the record.  (Tr. 148)

On September 18, 2001, neurologist Muhammad Najjar reported
to Dr. Ornowski that an EMG of the nerves in Manley's lower
extremities showed peripheral polyneuropathy.  (Tr. 134) However,

2

Dr. Najjar stated that it could not be determined whether the neuropathy was demyelinating or axonal.  (Tr. 135) On October 5 and 22, 2001, Manley complained of a very painful leg and back pain.  (Tr. 149) An October 15, 2001 MRI scan of Manley's back revealed herniated and compressed discs at L4-L5 and L5-S1.  (Tr. 140, 273) In a follow-up exam, Dr. Najjar stated that Manley had responded well to Lidoderm Patches and that his gait had "significantly improved" since his last visit to only a "mild limp due to the pain."  (Tr. 273) Dr. Najjar noted that Manley had muscle strength of 5/5 in all extremities and an intact light touch and pinprick sensation, although he had a decreased vibration sensation in both feet.  (Tr. 273)

Dr. Lawrence Ferguson at the Institute for Spine Care examined Manley on January 15, 2002.  Dr. Ferguson reported that plaintiff complained of low back and leg pain since October 2001 and had numbness in his feet when he was lying flat on the bed with his legs outstretched.  (Tr. 169) He also noted that Manley's MRI scan showed an edemaous right L5-S1 root and bone spurs at L4-5.  (Tr. 169)

On February 18, 2002, Dr. Ferguson performed a laminectomy at the L4-L5 level to correct Manley's back problems.  (Tr. 151) This was his second back surgery; the first was in 1990.  (Tr. 327-28) On April 19, 2002, Manley reported a pain rating of 5/10 to the physical therapist at Ingalls Memorial Hospital.  (Tr. 176) He described this pain as getting worse with prolonged sitting, prolonged walking, or changing positions, but he said

3

that moving around eased the pain and that he was able to get comfortable at night.  (Tr. 185) In Manley's three subsequent therapy sessions between April 22 and 29, 2002, he rated his pain between 2 and 4/10. (Tr. 179-81) On April 30, 2002, Ingalls discharged Manley, noting that he had not met any of his long-term goals because he was seen only for two out of the four recommended weeks.  (Tr. 177) However, the therapist stated that Manley's prognosis was identified as "good."  (Tr. 177)

On June 12, 2002, Manley applied for social security bene-fits based on discogenic and degenerative back disorders and Diabetes Mellitus.  (Tr. 21, 70) In the accompanying Adult Disability Report, he stated that his ability to work was limited by his back condition, Diabetes, Cholesterol, and numbness in the legs and feet.  (Tr. 70) Following an interview at the Field Office, interviewer Perez reported that Manley had some trouble sitting, standing, and walking, had a slow gait, and sat up "very straight" in the chair during his interview.  (Tr. 81)  In a July 8, 2002 questionnaire associated with his application, Manley stated that he was slower in his activities of daily living because of his back injury and that he could walk 3/4 of a mile and climb nine steps before the pain and numbness in his feet and legs caused him to stop.  He also said he could carry only 10 pounds without back pain.  (Tr. 83)

On July 22, 2002, Manley visited the Sibley Medical Clinic complaining of numbness in his feet as well as back pain.  (Tr. 110) The clinic's assessment of his condition included Peripheral

4

Neuropathy, Diabetes, high cholesterol, and alcoholism.  (Tr. 110)

On August 15, 2002, Dr. Suresh Mahawar examined Manley for the Disability Determination Bureau.  (Tr. 194) Manley reported to Dr. Mahawar that he had numbness in his feet and back pain that radiated down to his right leg which got worse with walking, standing, and sitting but better with lying down.  (Tr. 194) He stated that he could walk eight blocks and climb three flights of stairs.  (Tr. 194) Upon examination, Dr. Mahawar did not find significant tenderness or spasms in the spine.  (Tr. 195) He reported that Manley's motor and grip strength was 5/5 and that his fine and gross manipulations were normal, although his sensation was decreased in his feet bilaterally.  (Tr. 195) He had no muscle atrophy in all four extremities and had no evidence of redness, warmth, and effusion in any joint.  (Tr. 195) Dr. Mahawar observed that Manley's gait and station were normal, that he had no trouble getting on or off the exam table, tandem walking, or walking on toes or heels, but that he had mild difficulty squatting and hopping on one leg.  (Tr. 196) His diagnostic impression was of chronic low back pain, numbness in both feet likely due to neuropathy, and diabetes.  (Tr. 196)

On August 20, 2002, Manley saw Dr. Angela Martinez at St. Margaret Mercy Hospital after injuring his ankle by tripping over himself.  (Tr. 199) The radiologist report concluded that Manley had moderate soft tissue swelling in the ankle but that there was no evidence of any osseous or joint pathology.  (Tr. 201)

5

Dr. F. Montoya completed a Physical Residual Functional Capacity Assessment on August 22, 2002, in which he found that Manley occasionally could lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours, and sit about six hours in a normal eight-hour workday and that he was not limited in his ability to push and/or pull.  (Tr. 207)

On September 23, 2002, Manley again visited the Sibley Medical Clinic.  The records show his diabetes was controlled but he still had high cholesterol and neuropathy.  (Tr. 107) The clinic prescribed an improved diet, recommended he continue to take his medication, and abstain from alcohol.  (Tr. 107)[1]  A second note from December 2, 2002 stated that Manley still experienced peripheral neuropathy as well as foot pain and likely severe neuropathy.  (Tr. 232) In a disability report filed with his request for reconsideration on October 15, 2002, Manley reported increasing numbness in his feet, trouble sitting or walking for any length of time, and difficulties with daily chores.  (Tr. 100)

On December 4, 2002, Manley underwent a venous and arterial evaluation.  According to radiologist J.H. Wortman, an ultrasound test did not reveal any evidence of venous thrombosis.  (Tr. 264) Additionally, results of segmental pressures and Doppler wave

---

[1] On June 12, 2002, in his Adult Disability Report, Manley listed his medications as Actos, Glucotrol, Glucophage, and Zocor.  (Tr. 75) According to Manley,s request for a hearing before the ALJ, he was taking Metformin, Actos, Glucotrol, Lipitor, and Amitriptyline.  (Tr. 102)

6

forms on both legs were normal and did not show significant arterial disease in either leg.  (Tr. 263)

Dr. Martinez referred Manley to Ophthalmologist Alice Karpik, who saw Manley on December 12, 2002.  (Tr. 283) Manley complained of difficulty with night vision, floaters, and seeing halos.  (Tr. 283) On December 17, 2002, Dr. Karpik notified Dr. Martinez that Manley's vision was 20/20 R and 20/30 L with his glasses, but that exams showed moderately-severe clinically significant macular edema in the left macula.  (Tr. 272) In order to correct the edema, Manley had laser eye surgery at St. Catherine Hospital on January 20, 2003.  (Tr. 285) The surgery went well with no complications.  (Tr. 285)

In a February 3, 2003 report, Dr. Martinez reported that Manley continued to complain of severe bilateral foot pain at between 7 and 9/10.  (Tr. 227) She stated that he had a history of "diabetic peripheral neuropathy" and reported that, upon examination, his feet had a decreased sensation to touch.  (Tr. 227-28) She concluded that he had severe diabetic neuropathy with bilateral foot pain, Type II Diabetes mellitus with microvascular complications, and hypercholesterolemia.  (Tr. 228)

Manley had exams by Dr. Karpik to assess the results of the surgery on February 26 and May 1, 2003.  (Tr. 278, 279) On the later date, she found his vision to be 20/20 and 20/30 plus in the right and left eyes respectively and reported that while his diabetes fluctuated, he thought his vision was the same.  (Tr. 278) On September 18, 2003, Dr. Karpik found that Manley's vision

7

was 20/20 and 20/40.  (Tr. 288) Manley stated that he needed bifocals to read although they made him trip while walking, and he reported some floaters, had a cotton wool spot on his eye, and had not stopped smoking.  (Tr. 288) Dr. Karpik noted macula edema, recommended a second eye surgery, and set a new appointment in three months.  (Tr. 288)

During the ALJ hearing on October 1, 2003, Manley testified that he could not drive and that he had trouble walking up and down stairs or walking for long distances because of the numbness in his feet, although the circulation in his feet improved with short walks.  (Tr. 323-25) Though his doctors advised him to walk, he could walk only two to three times per week due to the pain.  (Tr. 331) The farthest he could walk was eight blocks in a round trip which would take him between one and two hours with rest breaks.  (Tr. 329) He also stated that shooting pains in his back and numbness in his legs interfered with sleeping and that he was unable to stand in one place for very long.  (Tr. 328-29) Manley testified that his feet were most comfortable when he was reclined and that they were constantly cold.  (Tr. 331) With respect to manipulative abilities, he stated that he could lift a gallon of milk, had no problems with zippers, and had mild problems with buttons.  (Tr. 330) He described headaches when in bright light and stated that he tripped over objects due to his poor sight.  (Tr. 332) He stated that he wore bifocals to read and reported a "halo effect" and "floaters" in his vision.  (Tr. 332)

8

Next, Manley's girlfriend, Aloma Robinson, testified. According to Robinson, Manley no longer trusted his legs and feet and constantly shifted while sitting and rested frequently if walking. (Tr. 334) She concurred that the best position for him was reclining with his feet up high. (Tr. 335) She testified that Manley's feet were like ice and that he recently damaged his toenail without noticing because he could not feel when things hit his feet. (Tr. 334-35) She further stated that Manley's vision was poor and that he has run into things because he was unable to see. (Tr. 335) She stated that Manley was unable to help with household chores and usually took a pain reliever after going on a walk. (Tr. 336)

Following Robinson's testimony, Medical Advisor Dr. Ashok Jilhewar testified that Manley suffered from diabetes mellitus with the complication of peripheral neuropathy and retinopathy. (Tr. 338-39) With respect to the neuropathy, Dr. Jilhewar stated that the evidence did not reveal whether the neuropathy was "axonal," dealing with the nerve itself, or "demyelinating," dealing with the nerve coating. (Tr. 338) Dr. Jilhewar noted that the record did not contain "documentation of motor disorganization of the peripheral neuropathy" and that the earliest physician's notation of foot numbness he could find was from 2002. (Tr. 338) He concluded that Manley suffered only from "sensory" neuropathy which would explain occurrences like Manley described where he would hit his toenail and not feel it. (Tr. 339, 348)

9

Regarding Manley's retinopathy complication, Dr. Jilhewar noted that after Manley's January 2003 laser surgery on the left eye, he had 20/20 vision in his right eye with correction and "20 over 30 plus" in the left eye.  (Tr. 339-40) He further noted that Dr. Karpik recommended a second laser surgery on September 18, 2003 to prevent a "vitreous hemorrhage."  Although this condition could result in blindness, it also could be prevented with another operation and thus not last 12 continuous months. (Tr. 340) He admitted, however, that he had "no way of knowing" if complications from surgery would arise but said if they did not, the progression of this impairment would clinically not be expected to last 12 months.  (Tr. 346) Additionally, Dr. Jilhewar testified that the floaters in Manley's vision were unrelated to diabetes but that the macula swelling noted by Dr. Karpik was related to the diabetes and would result in temporary vision problems.  (Tr. 346-47) However, Dr. Jilhewar concluded that Dr. Karpik believed Manley was safe from going blind because she did not schedule another appointment until three months later.  (Tr. 347)

Turning to Manley's back impairment, Dr. Jilhewar observed that the record did not contain any documentation of "motor disorganization in the lower extremities and therefore 1.04(a) listing is not met or equaled."  (Tr. 341) Dr. Jilhewar again emphasized that "for the retinopathy and for the peripheral neuropathy, 9.08 and its subparts are not met or equaled."  (Tr. 341) Finally, Dr. Jilhewar noted that Manley's cold feet were a

10

symptom of a capillary disease unrelated to diabetes and found that the records lacked objective findings of the disorder and that a listing was not met or equaled.  (Tr. 341-42) Further, the combination of back problems and complications from diabetes would not equal the listings.  (Tr. 343) However, Dr. Jilhewar believed that Manley was more restricted than the "light" cate-gorization given to him by agency doctors as not "enough weight was given to the evidence of peripheral neuropathy as well as persistence of the low back problems."  (Tr. 343) He restricted Manley to sedentary work with the additional restrictions of not working around unprotected heights, moving machinery, and not crawling or kneeling, but bending occasionally.  (Tr. 344)

Finally, VE Ervin Roth testified that an individual of Manley's age, education and work experience who was limited to lifting ten pounds occasionally and five to ten pounds fre-quently, limited to standing and/or walking two hours, limited to sitting with the ability to shift in his seat, occasionally bend and climb stairs, never crawl, kneel or climb ladders or be around unprotected heights or moving machinery could not do any of Manley's past relevant work.  (Tr. 351) However, the VE identified over 8,000 sedentary jobs, including hand packer, bench workers, and electronic worker assembler that would allow for such limitations.  (Tr. 351) According to VE Roth, none of these jobs would allow a person to recline and keep his feet up at head level at any point during the day.  (Tr. 352)

11

In his decision denying benefits, ALJ Asbille determined
that Manley was not engaging in substantial gainful activity at
Step One and that Manley's "back disorder, diabetes mellitus and
resulting residuals involving peripheral neuropathy, numbness in
the feet, and eye problems" were "severe" at Step Two.  (Tr. 16)
However, the ALJ concluded at Step Three that the record lacked
"specific clinical signs and diagnostic findings required to meet
or equal the requirements set forth in the Listing of Impair-
ments."  (Tr. 17)

In support of his Step Three conclusion, ALJ Asbille noted
that Manley had two laminectomy surgeries, that Lidoderm Patches
improved Manley's back pain and "significantly improved" his gait
in 2001, and that Dr. Najjar's physical examination of Manley in
October 2001 showed unremarkable cranial nerves and deep tendon
reflexes, full muscle strength in his arms and lengths, and a
normal sensory examination except for a decreased vibration
sensation in both feet.  (Tr. 17) The ALJ summarized Dr. Najjar's
recommended course of treatment with more Lidoderm patches and
physical therapy.  (Tr. 17) He noted that neurological findings
did not "suggest significant radiculopathy" stemming from Man-
ley's back pain.  (Tr. 17) As for Manley's diabetes-related
impairments, ALJ Asbille noted Manley's February 23, 2003 arte-
rial Doppler test to check for clots, and Dr. Martinez's ultimate
diagnosis of "severe diabetic neuropathy with bilateral foot
pain; diabetes mellitus type II with micro vascular complica-
tions; [and] hypercholesterolemia."  (Tr. 17) He further noted

12

Dr. Jilhewar's statement that treatment was expected to resolve Manley's bleeding of the eyes so it would not last 12 months, and that Manley's vision of 20/30 R and 20/40 L at the time of the hearing was considered "significant vision" by Dr. Jilhewar. (Tr. 17) The ALJ noted that despite evidence of severe foot numbness and occasional falls, Manley could ambulate short distances and walk eight blocks.  (Tr. 17)

After finding that Manley could not perform his past work at Step Four, ALJ Asbille found that Manley's testimony regarding his pain and functional limitations was not totally credible at Step Five.  (Tr. 18) The ALJ stated that no doctor had ordered Manley to rest throughout the day with his legs elevated, that the numbness in his feet was sensory, and that he could ambulate well enough to perform sedentary work.  (Tr. 18) In determining Manley's RFC, the ALJ then rejected the agency physician's RFC determination in support of Dr. Jilhewar's more restrictive recommendations at the hearing.  (Tr. 18) Thus, the ALJ concluded that Manley still could perform 3,500 hand packer jobs, 1,000 bench worker positions, and 5,000 jobs as a telephone solicitor. (Tr. 19)

On April 26, 2004 and May 3, 2004, Manley supplemented the record before the Appeals Council with new evidence.  (Tr. 303-315) On April 26, Manley submitted a Podiatrist report from November 7, 2003; a Neurological exam from March 11, 2004; and two Opthamological exams dated December 16, 2003 and April 1, 2004.  (Tr. 303-312) On May 3, Manley provided a Nerve and

13

Sensory study dated April 7, 2004.  (Tr. 313-15) The Appeals Council denied Manley's request for review on June 10, 2004, but noted in the order that it was incorporating the evidence submitted on April 26 and May 3, 2004, into the record.  (Tr. 5-9)

On October 29, 2004, Manley submitted more evidence to this court with his brief in support of reversal or remand.  The new evidence includes the information sent to the Appeals Council as well as opthamological reports from June 3 and 22, 2004, which documented Manley's ongoing eye problems, reports regarding Manley's second laser surgery on June 25, 2004, excerpts from various medical reference books, reports of Manley's back condition ranging from March until July 2004, and documentation of his glucose level.  In light of the new evidence submitted to the Appeals Council and to this court, Manley asks for a remand based on sentence six of 42 U.S.C. §405(g), or in the alternative, a reversal of the ALJ's final decision denying disability benefits.

<u>Discussion</u>

I.  Sentence Six Remand

A district court may order the final decision of the Social Security Commissioner remanded under sentence six if "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. §405(g); Kapusta v. Sullivan, 900 F.2d 94, 97 (7th Cir. 1989); Anderson v. Bowen, 868 F.2d 921, 927 (7th Cir. 1989); Sears v. Bowen, 840 F.2d 394, 399 (7th Cir. 1988).  The additional evidence is reviewed by the court only for

14

the purpose of determining if a remand is necessary and is
ignored when considering if the ALJ's decision is supported by
substantial evidence.  Eads v. Secretary of the Department of
Health and Human Services, 983 F.2d 815, 817 (7th Cir. 1993).
Evidence is considered new if it was "not in existence or avail-
able to the claimant at the time of the administrative proceed-
ing."  Sample v. Shalala, 999 F.2d 1138, 1144 (7th Cir. 1993)
(internal citations omitted).  See also Perkins v. Chater, 107
F.3d 1290, 1296 (7th Cir. 1997).  However, new conclusions by
doctors or other experts made on the basis of evidence already
available in the record are not considered "new" for the purposes
of a sentence six remand.  Jens v. Barnhart, 347 F.3d 209, 214
(7th Cir. 2003).  See Perkins, 107 F.3d at 1296; Sample, 999 F.2d
at 1144.

The party seeking remand also must have a good reason for
not presenting the evidence during the administrative proceed-
ings.  While the exact definition of "good cause" in this context
is somewhat elusive, it is clear that new evidence that was not
in existence until after the close of administrative proceedings
meets the standard of "good cause."  See Sears, 840 F.2d at 399
("We believe Sears has demonstrated good cause . . .  The report
itself did not exist until after the Appeals Council had denied
his claim."); Godsey v. Bowen, 832 F.2d 443, 444 (7th Cir. 1987)
("Contrary to the government's submission, the requirement of
good cause for a belated submission was satisfied; evidence of
deterioration after the hearing could not have been submitted at

15

the hearing."); Watkins v. Chater, No. 93 C 4603, 1995 WL 493460, at *8 (N.D. Ill. Aug. 16, 1995) ("The fact that the operation took place two years later would provide Plaintiff with good cause for not introducing evidence of the operation during the administrative hearing").  The requirement that good cause be shown "reflects a congressional determination to prevent the bad faith manipulation of the administrative process."  Milano v. Bowen, 809 F.2d 763, 767 (11th Cir. 1987).

The final requirement, materiality, means that "there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered."  Perkins, 107 F.3d at 1296.  See also Schmidt v. Barnhart, 395 F.3d 737, 742 (7th Cir. 2005); Sears, 840 F.2d at 400.  In the Seventh Circuit, "medical records postdating the hearing and that speak only to the applicant's current condition, not to his condition at the time his application was under consideration by the Social Security Administration, do not meet the standard for new and material evidence."  Schmidt, 395 F.3d at 742 (internal quotes omitted)(citing Kapusta, 900 F.2d at 97).  See also Anderson, 868 F.2d at 927 ("Remand for consideration of additional evidence is appropriate only upon a showing that the evidence is new and material to the claimant's condition during the relevant time period encompassed by the disability application under reivew.");  Godsey, 832 F.2d at 445 ("The fact that her condition had deteri-orated by 1986 does not show that in 1983 it was otherwise than found at the administrative hearing").

It is clear that the evidence of eye impairments Manley submitted after the ALJ's decision is "new" for the purpose of a sentence six remand.  The evidence post-dates the ALJ's decision and the October 1, 2003 administrative hearing.  The documentation and reports of eye exams are not based on evidence previously in the record but instead offer further evidence as to Manley's visual impairment.  As such, they meet the requirement of "new" for a sentence six remand.  The excerpts from various medical reference books, however, do not meet the "newness" standard.  Intended to refute Dr. Jilhewar's testimony regarding the relation of "floaters" to diabetes, these books were in existence and available to Manley before the close of administrative procedures and thus do not qualify as "new" evidence.

Good cause also exists for the introduction of Dr. Karpik's December 15, 2003, April 1, 2004, June 22, 2004, and June 25, 2004 opthamological exams.  The December 15 and April 1 exams were submitted to the Appeals Council within the given time frame and were incorporated into the record by the Council.  Similarly, the exams contained within the plaintiff's brief dated June 22 and June 25, 2004 could not have been submitted to the Appeals Council since the Council already had made its decision not to review.  Although the June 3, 2003 exam might have been included in the record earlier, as it was conducted one week before the Appeals Council released its decision, it is clear that the inclusion of this new evidence is part of the overall attempt to document the ongoing deterioration of Manley's vision.  June 3,

17

2003 also is sufficiently close to the date of the actual Appeals
Council decision that it is likely that the report could not have
been incorporated or considered anyway.  Manley therefore has
good cause for not having submitted this new evidence sooner.
However, Manley does not offer any reason why the excerpts from
medical reference books were not submitted before the close of
administrative procedures.  Thus, in addition to not being "new,"
there is no good cause for Manley's failure to include these
excerpts earlier in the process.

Despite meeting the "new" and "good cause" requirements, the
additional evidence of eye impairments is not material.  All of
this evidence relates to Manley's medical condition after the
October 1, 2003 ALJ hearing and does not speak to his condition
at the time of the hearing or before.  The eye exams refer only
to Manley's status after the relevant time period for his appli-
cation had come to a close and therefore could not have affected
the ALJ's decision.

Nevertheless, Manley argues that this evidence is material
because it refutes Dr. Jilhewar's testimony regarding the 12-
month duration requirement upon which the ALJ relied when deter-
mining Manley's disability with regard to his eye problems.
Specifically, Manley refers to Dr. Jilhewar's statement that
laser surgery could correct the problems with the eye and prevent
a vitreous hemorrhage, and thus the impairment was "not expected
to last 12 plus continuous months from 9/18/2003 and therefore
from Social Security perspective . . . it would have no affect on

18

the [INAUDIBLE] of functional capacity."  (Tr. 340) As a result

of this testimony, ALJ Asbille twice noted that Manley's eye

problems were not expected to last 12 months.  (Tr. 17, 18)

Manley argues that the new evidence is material because it shows

that the ALJ's decision regarding Manley's RFC classification was

wrong because the ALJ relied on the erroneous testimony of Dr.

Jilhewar and thus proposed a faulty hypothetical to the Voca-

tional Expert, Dr. Roth.

The relevant social security regulation states that "[u]n-

less [the claimant's] impairment is expected to result in death,

it must have lasted or must be expected to last for a continuous

period of at least 12 months.  We call this the duration require-

ment."  20 C.F.R. §404.1509.  Under Social Security Ruling 82-52,

an "adjudication on the basis of 'insufficient duration,' there-

fore, indicates that a claim which would have been allowed must

instead be denied because the claimant's impairment was not or

will not be disabling for at least 12 months."  See SSR 82-52, at

*3.  To make this determination, SSR 82-52 instructs the Secre-

tary to consider "the nature of the impairment, the therapeutic

history, and the prescribed treatment."  See SSR 82-52, at *2.

The new evidence provided by Manley is not material to Dr.

Jilhewar's claim about the 12-month duration requirement and the

subsequent decision of the ALJ not to include visual impairments

in his hypotheticals.  Dr. Jilhewar testified that laser surgery

would correct the problems in Manley's eye (absent unforeseen

complications) and thus the 12-month duration requirement would

not be met.  (Tr. 340) The evidence incorporated by the Appeals
Council and the additional evidence submitted along with Manley's
brief does nothing to refute this diagnosis.  Indeed, it supports
Dr. Jilhewar's argument that the problem could get worse, ending
in eventual blindness, if not treated with laser surgery, which
it was on June 25, 2004.[2]  There is no "new" evidence that dis-
proves Dr. Jilhewar's testimony.  It is clear from his statements
at the hearing that Dr. Jilhewar formed his opinion as to the
duration requirement by considering the nature of the eye impair-
ment, the history of past treatment, and if the prescribed
treatment would cure the problem.  Thus, the evidence of the
plaintiff's continuing eye problems is not material and does not
meet the standards for a sentence six remand.

Manley also requests a sentence six remand based on addi-
tional evidence submitted regarding his back problems.  Manley
contends that the new reports submitted with his opening brief
show that his functional limitations due to his back impairments
are greater than initially believed.  Citing Social Security
Ruling 83-20, Manley argues that these reports are material
because an inference can be made that the underlying conditions
of his back problems existed prior to the close of administrative
proceedings.  In particular, Manley argues that these reports
show polyneuropathy, L4-5 scar tissue, and a herniated disc at
L5-S1.  However, all of these conditions already were present in

---

[2] The record does not contain any information as to the success of the
surgery.

the record and were repeated numerous times.  (Tr. 131-32, 140,
164, 170-71, 270) They are neither new or material.  Manley's
citation to SSR 83-20 also is misplaced in that SSR 83-20 refers
to the disability's onset date, which was established as October
1, 2001 and which never was questioned during these proceedings.
Indeed, the final determination of an onset date only becomes
necessary once disability actually has been established.  Mack v.
Shalala, No. 92-3922, 1993 WL 483308, at *2 (7th Cir. Nov. 22,
1993).  Further, the "inference" that Manley would have this
court draw is unnecessary as the tests reveal nothing new that
was not already in the record and diagnosed by doctors as far
back as October 15, 2001.  (Tr. 140, 164, 270)

Finally, Manley also claims new evidence of carpal tunnel
syndrome and argues that early signs could be inferred from the
record.  The fact that Manley testified at the hearing that he
had some trouble with buttons and no trouble with zippers hardly
qualifies as evidence of early carpal tunnel syndrome.  There was
no suggestion on the record that his troubles were indicative of
a recognized impairment.  Manley never complained of manipulative
limitations to any physician, nor were there medical findings of
such a problem.  This argument constitutes a new claim by the
plaintiff and will not be considered here.  In this situation,
when evidence from after the close of administrative proceedings
shows that the plaintiff's condition has deteriorated to the
point that disability should be found, the remedy is not remand

but to file a new application for benefits.  Godsey, 832 F.2d at 445.

## II.  Substantial Evidence

In the alternative, the plaintiff asks this court to reverse the ALJ's decision because his findings were not supported by substantial evidence.

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g)  ("The findings of the Commisioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003);  Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct 1420, 1427, 28 L.Ed.2d 852 (1972) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).  See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002);  Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  Golembiewski, 322 F.3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."

Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir.
2003).

Disability and supplemental insurance benefits are available
only to those individuals who can establish "disability" under
the terms of the Social Security Act.   The claimant must show
that he is unable "to engage in any substantial gainful activity
by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Secu-
rity regulations enumerate the five-step sequential evaluation to
be followed when determining whether a claimant has met the
burden of establishing disability.   20 C.F.R. §§404.1520,
416.920.  The ALJ first considers whether the claimant is pres-
ently employed or "engaged in substantial gainful activity." 20
C.F.R. §§404.1520(b), 416.920(b).   If he is, the claimant is not
disabled and the evaluation process is over; if he is not, the
ALJ next addresses whether the claimant has a severe impairment
or combination of impairments which "significantly limits . . .
physical or mental ability to do basic work activities."  20
C.F.R. §§404.1520(c), 416.920(c).  Third, the ALJ determines
whether that severe impairment meets any of the impairments
listed in the regulations.  20 C.F.R. § 401, pt. 404, subpt. P,
app. 1.  If it does, then the impairment is acknowledged by the
Commissioner to be conclusively disabling.  However, if the
impairment does not so limit the claimant's remaining capabili-

ties, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. §§404.1520(e), 416.920(e).  However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §§404.1520(f), 416.920(f).

Only the final decision of the Commissioner of Social Security is reviewable by this court.  42 U.S.C. §405(g).  When the Appeals Council refuses to review the ALJ's decision, the ALJ's opinion becomes the final decision, and "[t]he correctness of that decision depends on the evidence that was before him."  Eads, 983 F.2d at 817.  Any additional evidence submitted to the Appeals Council is not part of the record for purposes of judicial review.  Eads, 983 F.2d at 817.  See also Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995); Luna v. Shalala, 22 F.3d 687, 689 (7th Cir. 1994); Mygrant v. Callahan, No. 3:96-CV-826RP, 1998 WL 175873, at *20-21 (N.D. Ind. Jan. 8, 1998).  Thus, the evidence submitted to the Appeals Council and the evidence included in Manley's opening brief will not be considered for purposes of

determining whether the ALJ's decision was supported by the substantial evidence.

Manley first argues that the ALJ should have found at Step Three that Manley's impairment of diabetes mellitus met or equaled listing 9.08A, which covers diabetes mellitus with "[n]europathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station."  Listing 9.08A specifically references Listing 11.00C:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment.  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

The claimant bears the burden of proving that his condition meets or equals listing 9.08A.  20 C.F.R. §404.1512c; Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004); Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999) (citing Steward v. Bowen, 858 F.2d 1295, 1297 n.2 (7th Cir. 1988)).  To do so, the claimant must "satisfy all of the criteria of the listed impairment." Maggard, 167 F.3d at 380.  See also Pope v. Shalala, 998 F.2d 473, 480 (7th Cir. 1993); Anderson v. Sullivan, 925 F.2d 220, 223 (7th Cir. 1991).

Specifically, Manley contends that when making his findings, the ALJ relied on erroneous testimony of the Medical Advisor, Dr. Jilhewar, that sensory neuropathy does not form part of the listing for 9.08A.  Further, Manley argues that his condition meets the listings requirements not only for sensory neuropathy but also motor neuropathy, so that the ALJ's decision was not supported by substantial evidence.

The transcript of Dr. Jilhewar's testimony is incomplete and often hard to decipher due to frequent inaudible portions. However, the main thrust of the questioning still can be discerned.  In responding to ALJ Asbille's questions, Dr. Jilhewar testified:

> A:   ... What I wanted to mention, Your Honor, that there's no documentation of motor disorganization of the peripheral neuropathy.  For the listing purposes it would have an element one zero zero. [INAUDIBLE].
>
> Q:   I think based on his descriptions the neuropathy has not quite got to the point that it meets the listings.
>
> A:   No.  Well, yes, but [INAUDIBLE], many kinds of neuropathy, sensory, motor and painful neuropathy.  He has the sensory neuropathy.  And what [INAUDIBLE], Your Honor, was peripheral neuropathy listing [INAUDIBLE] claimant .14.  The left plus two element 104(b) and element 104(b) requires presence of a significant and a persistent disorganization of motor functioning and there is no documentation of that.  That's what I was trying to mention.
>
> Q:   Right.
>
> (Tr. 339)

26

Later in the same hearing, Dr. Jilhewar answered questions re-
garding Listing 9.08A from Manley's attorney:

> Q:  Yeah. Okay.  Then the other question I
>     had is the sensory neuropathy in his
>     feet was diagnosed by an EMG and what is
>     the - is there - in the listings they
>     don't talk about sensory neuropathy
>     right?
>
> A:  Yeah.  Because you [INAUDIBLE] feeling.
>     Yes.
>
> Q:  You have to have motor - so there's no
>     listing that covers the sensory peri-
>     pheral neuropathy?
>
> A:  It doesn't need to be.  The only thing
>     happens with the sensory neuropathy is
>     if he doesn't take care of it he may get
>     like she said something happened to his
>     nail.  He can hit the nail and he won't
>     feel it or if it happens in a finger
>     people - my patients usually smoke and
>     they burn their finger with the smoke.
>
> (Tr. 348)

Listing 9.08A makes clear that not only must the claimant
have neuropathy (whether it be sensory or motor) but that the
neuropathy must be accompanied by significant and persistent
disorganization of motor function in two extremities.  In his
testimony, Dr. Jilhewar stated that Manley had sensory neuropathy
but he sought to emphasize the lack of documentation of motor
disorganization.  (Tr. 338-39, 348) Contrary to Manley's argu-
ment, Dr. Jilhewar was not saying that there is no listing for
sensory neuropathy; but rather that Manley does not meet the
listing because his sensory neuropathy is not documented to
include disorganization of motor function in two extremities.

27

This conclusion, adopted by the ALJ, is supported by sub-
stantial evidence.  The ALJ found that although Manley did suffer
from numbness in his feet, he still maintained the ability to
ambulate up to eight blocks with rest breaks.  (Tr. 17) Dr.
Najjar's examination in October 2001 noted that Lidoderm patches
improved Manley's gait and that he had only a mild limp "due to
pain."  (Tr. 131) On August 15, 2002, Dr. Mahawar found that
Manley's gait and station were "normal," that he had no trouble
getting on or off the exam table, tandem walking, or walking on
his toes or heels, and that he had only mild trouble squatting
and hopping on one leg.  (Tr. 195, 196) Though medical records
from St. Margaret Mercy show that Manley injured his ankle by
tripping over himself, Manley failed to show that this was a
direct result of his neuropathy or that it happened on a consis-
tent, regular, and documented basis.  (Tr. 199) Manley himself
testified that although he has trouble walking, the walking
actually helped to circulate the blood in his feet and that he
could walk eight blocks in a round trip as long as he could have
rest breaks.  (Tr. 324, 329) Although Manley testified that his
feet felt best when elevated above his head, his counsel acknow-
ledged that the medical evidence did not contain any such re-
striction.  (Tr. 354) Therefore, the court finds that the ALJ's
decision at Step Three was supported by substantial evidence.

Manley also argues that ALJ Asbille erred at Step Four by
failing to consider Manley's visual impairments for the purpose
of determining his RFC and thus at Step Five when he excluded

visual limitations from the hypothetical he posed to the Voca-
tional Expert.  Manley asserts that the speculative testimony of
Dr. Jilhewar regarding the 12-month duration requirement is not
sufficient grounds for eliminating the visual impairment from
consideration.

The ALJ's determination that Manley's visual impairment
would not meet the 12-month duration requirement is supported by
substantial evidence.  As noted above, none of the evidence of
visual impairments submitted after the November 25, 2003 ALJ
decision can be considered by this court.  The evidence available
to ALJ Asbille provides adequate support for his finding that
"claimant's bleeding of the eyes is not expected to last for
twelve months as treatment is expected to resolve the problem."
(Tr. 17) Dr. Jilhewar examined the nature of Manley's eye problem
and its therapeutic history in his testimony by identifying a
"vitreous hemorrhage" and by discussing all of the available
examination records.  (Tr. 339-40) Dr. Jilhewar further consid-
ered Dr. Karpik's prescription of laser surgery and noted that
with this treatment, "this particular impairment is not expected
to last 12 plus continuous months."  (Tr. 340) Manley can point
to no evidence in the record before the ALJ that contradicts this
testimony and shows that Manley's vision problems will last more
than 12 months even with the laser surgery.  Thus, ALJ Asbille
properly excluded the evidence of Manley's visual impairment from
his RFC determination and hypothetical to the Vocational Expert.
Once again, if Manley believes that subsequent evidence shows he

is disabled, then the proper procedural avenue is to file a new application.

Finally, Manley briefly argues that substantial evidence does not support the ALJ's finding that he could perform sedentary work because of the numbness in his feet, and thus, that the ALJ's RFC finding was flawed in this respect as well.  Credibility determinations "are reserved for the ALJ, in part because the ALJ is able to observe the witness."  Kelley v. Sullivan, 890 F.2d 961, 964 (7th Cir. 1989).  Determinations of credibility by the ALJ are given great weight by the courts.  Kelley, 890 F.2d at 964; Cheshier v. Bowen, 831 F.2d 687, 690 (7th Cir. 1987); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982).  As such, the court will "not overturn an ALJ's credibility determinations unless they are patently wrong."  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).  See also Luna, 22 F.3d at 690.

Here, ALJ Asbille's finding that Manley is not totally credible is not patently wrong.  The ALJ observed that while Manley claimed to be most comfortable while reclining with his feet up, there was no evidence that a doctor prescribed this as a treatment, a point which Manley's attorney acknowledged.  (Tr. 18, 354) Manley also testified that walking helped to circulate the blood in his feet, and the record indicates that continued exercise was recommended by the doctors at Sibley Medical Clinic. (Tr. 107, 324) As noted above, Dr. Mahawar found Manley's gait and station to be "normal" as of August 2002, and all of the tests conducted on Manley's legs through the date of the hearing

generated normal results except for some decreased sensation in
the feet.  (Tr. 195-96, 201, 263-64, 273) Based on this objective
evidence, the ALJ was not patently wrong to find Manley's testi-
mony somewhat incredible or to find that Manley could perform
sedentary work with some additional limitations including never
being able to crawl, kneel, or climb ropes or ladders, and only
standing up to two hours per day.  (Tr. 18) Since the ALJ's RFC
determination was supported by substantial evidence on the
record, his hypothetical to the Vocational Expert, which included
these limitations, was entirely proper.  (Tr. 351)

_____

For the foregoing reasons, the Motion for Summary Judgment
filed by the plaintiff, Michael Manley, on October 29, 2004, is
DENIED.

ENTERED this 27th day of September, 2005


                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge

31